| | |
|---|---|
| Jessica Leah Kampschroer and Cory Patrick Kampschroer,<br><br>    Plaintiffs,<br><br>v.<br><br>Anoka County, et al.,<br><br>    Defendants. | Case No. 13-cv-2512 (SRN/TNL)<br><br><br><br>**ORDER** |

Sonia Miller-Van Oort, Jonathan A. Strauss, Lorenz F. Fett, Jr., and Robin W. Wolpert, Sapientia Law Group PLLC, 120 South Sixth St., Ste. 100, Minneapolis, MN 55402; Jeffrey M. Montpetit, Marcia K. Miller, Susan M. Holden, SiebenCarey, P.A., 901 Marquette Ave, Ste. 500, Minneapolis, MN 55402 for Plaintiffs.

Stephanie A. Angolkar, Jon K. Iverson, and Susan M. Tindal, Iverson Reuvers Condon, 9321 Ensign Ave. S., Bloomington, MN 55438, for Defendants Cities of Anoka, Apple Valley, Arlington, Baxter, Belle Plaine, Blaine, Bloomington, Braham, Brooklyn Center, Brooklyn Park, Brownton, Burnsville, Cambridge, Cannon Falls, Champlin, Chaska, Chisago City, Columbia Heights, Coon Rapids, Corcoran, Cottage Grove, Crosby, Crystal, Deephaven, Dundas, Eagan, Eden Prairie, Elk River, Fairmont, Faribault, Farmington, Foley, Forest Lake, Fridley, Glencoe, Golden Valley, Goodview, Hastings, Hopkins, Howard Lake, Hutchinson, Inver Grove Heights, Isanti, Jordan, Lakeville, Litchfield, Mankato, Maple Grove, Maplewood, Medina, Mendota Heights, Minnetoka, Montgomery, Moorhead, Morristown, Mounds View, New Brighton, New Hope, New Prague, Newport, North Saint Paul, North Mankato, Northfield, Owatonna, Prior Lake, Ramsey, Richfield, Robbinsdale, Rochester, Rosemount, Roseville, Sartell, Savage, Shakopee, Spring Lake Park, Saint Anthony Village, Saint Cloud, Saint Francis, Saint Louis Park, Saint Paul Park, Saint Peter, Staples, Stillwater, West Saint Paul, Waite Park, Wayzata, White Bear Lake, and Woodbury, and Defendants Centennial Lakes Police Department, Dakota Communications Center, and Lakes Area Police Department.

Ann E. Walther and Erik Bal, Rice, Michels & Walther, LLP, 10 Second St. NE, Ste. 206, Minneapolis, MN 55413 for Defendant Minneapolis Park and Recreation Board.

Toni A. Beitz, Daniel D. Kaczor, Beth A. Stack, Hennepin County Attorney's Office, 2000A Government Center, Minneapolis, MN 55487 for Defendant Hennepin County.

Cheri M. Sisk, City of St. Paul Attorney's Office, 15 West Kellogg Blvd., 750 City Hall and Courthouse, St. Paul, MN 55102 for Defendant City of St. Paul.

Douglas A. Boese, Gregory J. Griffiths, and Jennifer Marie Peterson, Dunlap & Seeger, P.A., 30 3rd St. SE, Ste. 400, Rochester, MN 55904 for Defendant Olmsted County.

Joseph E. Flynn and Robert I. Yount, Jardine, Logan & O'Brien, PLLP, 8519 Eagle Point Blvd., Ste. 100, Lake Elmo, MN 55042 for Defendants Counties of Beltrami, Benton, Blue Earth, Carver, Cass, Chisago, Crow Wing, Faribault, Fillmore, Goodhue, Grant, Hubbard, Isanti, Kanabec, Le Sueur, McLeod, Mille Lacs, Morrison, Nicollet, Pine, Rice, Scott, Sherburne, Stearns, Steele, Wadena, Washington, Winona, and Yellow Medicine.

Bryan D. Frantz, Anoka County Attorney's Office, 2100 3rd Ave., Anoka, MN 55303 for Defendant Anoka County.

Mark P. Hodkinson, Bassford Remele, P.A., 33 South 6th St., Ste. 3800, Minneapolis, MN 55402 for Defendant City of Edina.

Kristin R. Sarff, Lindsey E. Middlecamp, and Gregory P. Sautter, Minneapolis City Attorney's Office, 350 South 5th St., City Hall, Room 210, Minneapolis, MN 55415 for Defendant City of Minneapolis.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendants' Motions for Summary Judgment ("Mots. for Summ. J.") [Doc. Nos. 334, 339]. For the reasons set forth below, the Motions for Summary Judgment are granted and Plaintiffs' claims based on accesses that occurred prior to September 15, 2009 are dismissed.

## I.    BACKGROUND

### A.  Procedural History

Plaintiffs Jessica Leah Kampschroer and Cory Patrick Kampschroer (collectively, the "Kampschroers") assert claims under the Driver's Privacy Protection Act (the "DPPA") against Defendants. (*See* Second Am. Compl. [Doc. No. 20].) In relevant part,

the DPPA prohibits accessing an individual's private motor vehicle records without a permissible purpose. 18 U.S.C. §§ 2721(b), 2722(a). The Kampschroers allege that Defendants accessed Jessica's private records approximately 1,400 times, and Cory's records 92 times, for impermissible reasons between 2003 and 2013. (*See* Second Am. Compl. at ¶¶ 2–3.) Defendants are state and municipal entities—or divisions or agencies of those entities—such as counties, cities, police departments, and sheriffs' departments. Notably, the Driver and Vehicle Services Division ("DVS") of the Minnesota Department of Public Safety ("DPS") is not a Defendant.

Defendants previously moved to dismiss the Kampschroers' claims. (*See* Mots. to Dismiss [Doc. Nos. 54, 93, 99, 110, 116, 121, 126, 130, 131, 138, 141, 151, 155, 164].) The Court granted in part and denied in part these motions. *See Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124 (D. Minn. 2014), *aff'd,* 840 F.3d 961 (8th Cir. 2016). In relevant part, the Court held that the DPPA's four-year statute of limitations barred all of the Kampschroers' claims related to accesses that occurred prior to September 15, 2009, unless equitable tolling applied. *Id.* at 1136. The Kampschroers alleged that Pat McCormack ("McCormack"), the director of DVS, made "intentional and fraudulent" misrepresentations to them about the extent of Defendants' improper accesses, which caused the Kampschroers not to investigate the issue further. (*See* Second Am. Compl. at ¶¶ 410–26.) Notably, the Kampschroers did not allege that anyone other than McCormack misled them on this subject. Based on these allegations, the Court allowed

limited discovery on the issue of equitable tolling.[1]  *Kampschroer*, 57 F. Supp. 3d at 1137.

The parties engaged in equitable tolling-related discovery and Defendants now move for summary judgment, arguing that equitable tolling does not apply and thus the Kampschroers' claims based on accesses before September 15, 2009 are time-barred. (*See* Mots. for Summ. J.)  The Kampschroers contend that disputed material facts preclude summary judgment, or that the Court should decline to rule on the equitable tolling issue until additional discovery is completed.  (*See* Pls.' Mem. in Opp. to Mots. for Summ. J. ("Pls.' Mem. in Opp.") at 1–2 [Doc. No. 344].)

### B. Facts

#### 1. The Kampschroers

Jessica Kampschroer, who before her marriage to Cory Kampschroer was Jessica Miles ("Miles"[2]), has been a broadcast journalist since 1999.  (Aff. of Stephanie A. Angolkar ("Angolkar Aff.") [Doc. No. 337], Ex. 1 ("Miles Dep.") at 11–13[3]  [Doc. No. 337-1].)  Since 2003, Miles has been a news anchor and reporter for KSTP and KSTC, which are both owned by Hubbard Broadcasting.  (*Id.* at 13–14.)  Cory Kampschroer

---

[1] The Court, however, held that claims based on accesses before May of 2004 were time-barred. *Kampschroer*, 57 F. Supp. 3d at 1138.

[2] The majority of the relevant facts occurred before the Kampschroers were married. Thus, for the sake of clarity, the Court refers to Jessica Kampschroer by her maiden name, Miles.

[3] For all depositions, the Court cites to the page numbers as they appear in the deposition itself.

("Cory")[4] has also been a journalist since 1999. (Angolkar Aff., Ex. 2 ("Cory Dep.") at 15 [Doc. No. 337-2].) From 2006 until 2010, he was a news anchor and reporter for WCCO. (*Id.* at 16.) Since 2010, Cory has worked for Hubbard Broadcasting as its Digital Media Director. (*Id.* at 14.) The Kampschroers began dating in 2006 and were married in 2009. (Miles Dep. at 8–9.) They were living together in 2008. (*Id.* at 9.)

## 2. DVS, the Databases, and Audits

As previously described, DVS is a division of DPS and McCormack was at all relevant times its director. (*See* Angolkar Aff., Ex. 4 ("McCormack Dep.") at 14–15, 18–19 [Doc. No. 337-4].) In 2008, DPS maintained two databases—E-Support (sometimes referred to as the "DVS Database") and LE-Support—that contained personal information about Minnesota citizens such as name, address, driving record, motor vehicle records, warrants, etc. (*See id.* at 11–14, 26–27, 90.) The databases contained some of the same information, but the agencies and entities accessing these databases did so for different purposes. (*Id.* at 12, 21.) DVS employees used E-Support in connection with their duties related to drivers' licenses and vehicle records, while state, county, and municipal law enforcement agencies used LE-Support, but also had access to E-Support. (*Id.* at 14, 27–28, 35, 159.) In 2008, an information technology ("IT") department within DPS was responsible for overseeing the technical aspects of the E-Support and LE-Support databases. (*Id.* at 19, 89.) This IT department did not report to McCormack or DVS, but rather to the Commissioner of DPS. (*Id.* at 20.)

McCormack's responsibilities included supervising DVS employees and handling

---

[4] For the sake of clarity, the Court refers to Mr. Kampschroer by his first name, Cory.

discipline-related issues.  (*Id.* at 19.)  Part of her responsibilities included monitoring and auditing DVS employees' use of the E-Support database to ensure that their accesses were only for permissible purposes (i.e., job related and not out of personal curiosity). (*See id.* at 29, 32, 36, 51–52, 140.)  McCormack did not conduct the audits herself, but rather asked the IT department to run audits.  (*Id.* at 29, 91–92.)  McCormack would then review summaries of the audits, but not the audits themselves.  (*Id.* at 112–14.)

Occasionally, the DPS Commissioner would ask McCormack to assist with auditing law enforcement's use of the databases.  (*See id.* at 30–31, 35.)  For example, if DPS received a complaint about a law enforcement agency's accesses and wanted to audit that agency's use of E-Support, the Commissioner would ask McCormack to perform that audit.  (*See id.* at 34–35, 134.)  However, McCormack would only audit law enforcement accesses under such "special circumstances"—she had no authority to undertake such an audit on her own.  (*Id.* at 35–36, 40.)  McCormack explained that in 2008 she "didn't deal with law enforcement data" and that "law enforcement data was a whole different issue that was handled through . . . the Commissioner's office."  (*Id.* at 75.)  As a general matter, McCormack did not oversee law enforcement agencies' use of the databases and did not receive audit reports on such use.  (*Id.* at 75–76.)  Although law enforcement agencies had access to E-Support, DVS did not monitor their use of that database.  (*Id.* at 159.)

### 3.  The 2008 DVS Audit

In early 2008, McCormack had an "internal audit" done as part of her efforts to supervise and monitor her employees' use of E-Support.  (McCormack Dep. at 43–44,

47–49.)  For instance, this audit looked at whether DVS employees were accessing the database outside of work hours—a strong indication that such accesses were improper. (*See id.* at 141–42.)  The internal audit revealed that two DVS employees had accessed Miles' records.  (*See id.* at 50, 59–60, 95, 169–71.)  These accesses were investigated and McCormack testified that the accesses of one employee were deemed to be improper. (*See id.* 96–97, 100, 169–74.)  The employee who improperly accessed Miles' records was disciplined.  (*See id.* at 56–58, 137–38.)

The scope of this internal audit is important to the parties' arguments.  The audit did *not* encompass law enforcement or non-DVS county and municipal agencies.  (*See id.* at 169 (confirming that the audit was limited to DVS staff).)  The following exchange from McCormack's deposition describes the scope of the audit:

> Q:    Okay.  So do you recall specifically whether you then took the subjects of the accesses done by that particular employee and [sic] to see all of the accesses done by anyone of that employee *including state and county law enforcement personnel*?
>
> A:    *No, we have no authority over law enforcement*.  We wouldn't be doing anything to do with law enforcement.  …
>
> …
>
> Q:    Let me restate that.  So any subject – any audit of the subject of that employee's access *would not have encompassed any county or state employee* unless they worked for the deputy registrar's office or the drivers license bureau?
>
> A:    Well, I wouldn't because that's the only people that I had any type of oversight on.  *I certainly wouldn't have been able to do that or made that decision*.
>
> …

Q:     Okay.  So when you ran these internal audits, *you would not look at any accesses from any non-DVS employees* except for the deputy registrars and drivers license people, correct?

A:     *Correct.*

(*Id.* at 45–46 (emphasis added).)

### 4.  McCormack Contacts Miles

In late May of 2008, McCormack sent a letter to Miles regarding the DVS employee's accesses of her information.  (Angolkar Aff., Ex. 3 ("May 2008 DVS Letter") [Doc. No. 337-3]; McCormack Dep. at 41–42.)  The letter was on DPS letterhead, but clearly addressed a DVS employee only.  (May 2008 DVS Letter.)

Specifically, the letter informed Miles that after an "internal audit," DVS discovered that an "employee" had viewed Miles' driving record without authorization. (*Id.*)  It went on to state that there was no indication Miles' private data was used inappropriately, but rather that the "employee accessed private data for the [sic] purposes that were not work-related."  (*Id.*)  The letter apologized, noted that DVS had "taken the appropriate and allowable disciplinary actions necessary to address this matter with the employee," and stated that DVS would "address[] and reinforce[] its data privacy practices with other staff" and "continue to monitor employee use."  (*Id.*)   In her deposition, McCormack confirmed that the reference to continued monitoring of "employee use" was intended to refer to DVS employees only and not to any law enforcement officers. (McCormack Dep. at 65.)  Nowhere is there any mention of county or municipal agencies, or any state agency other than DPS.  However, because the May 2008 DVS Letter was on DPS letterhead, Miles assumed—erroneously—that it

"include[d] everyone," specifically, "city and county employees." (Miles Dep. at 109.)

Shortly after receiving the May 2008 DVS Letter, Miles called McCormack to discuss its contents.[5] (Miles Dep. at 26–27.) Miles took notes during this call. (Angolkar Aff., Ex. 5 ("Miles' First Call Notes") [Doc. No. 337-5]; Miles Dep. at 30–31.) Those notes read:

- had checked a celebrity out of curiosity
- no s.s.#
- just info on front of drivers license
- following up w/ disciplinary process until final is reached
- person does not live in the metro
- "basic curiosity"
- not used for any purpose, info not copied down
- don't believe this indvl. would fit profile of being concerned about

(Miles' First Call Notes.) McCormack would not identify the specific DVS employee for privacy reasons. (Miles Dep. at 32.) Miles states that she "was probably a little bit confused about the scope of the investigation" based on the May 2008 DVS Letter and her conversation with McCormack. (*Id.* at 33.) However, Miles admits that McCormack never represented that she was investigating city or county employees. (*Id.* at 45, 109.) There is no evidence that Miles ever requested that McCormack perform a more thorough audit, or provide her with the results of the internal audit that precipitated the May 2008 DVS Letter.

Miles believes that during the call, McCormack represented something to the effect that this was an "isolated incident." (Miles Dep. at 112–13, 119, 171.)

---

[5] McCormack recalls talking to Miles about the May 2008 DVS Letter, although she cannot recall whether Miles contacted her after receiving the letter, or if she contacted Miles just before sending the letter. (*Id.* at 41, 53–54, 126–27.)

McCormack states that she only told Miles what she knew—that a DVS employee accessed Miles' records for an unauthorized purpose. (*See* McCormack Dep. at 69–71.) The limited nature of what McCormack knew and communicated to Miles during this call is evident in this exchange from her deposition:

> Q:   And because you don't know about all of the other accesses that would have been made on Ms. Miles, of Ms. Miles' DL or DVS data, you certainly wouldn't have told her that this was an, quote, isolated incident, would you?
>
> A:   *It was isolated in terms of when I talked to her that was the only incident I was aware of.* …
>
> …
>
> Q:   Well, when you spoke to her, would you ever have represented to her that this was the only incident in which her data had been improperly breached and that there were no other individuals that would have accessed her information improperly, would you have ever made that representation to her in any way or form?
>
> …
>
> A:   *I think what I would have said to her is that this is the only instance that I have proof of someone looking at your data.  I would never have said something as broad as what you just said.*  I would never have said that.  … But I may have said to her the only thing I have information on is this lookup.  I may have said something like that to her. …
>
> …
>
> Q:   And you wouldn't have made any representations regarding any accesses by any county or city employees?
>
> A:   *I couldn't have because I didn't have any information on those things at the time.*
>
> …
>
> Q:   Yeah, and you were talking to her in the scope of being a single

audit of a single employee, correct?

A:      Correct.

(*Id.* at 69–73 (emphasis added); *see also id.* at 79–80, 157.)  McCormack was clear that she would not have discussed any accesses by county or city law enforcement personnel with Miles because that was not something she knew about.  (*Id.* at 86.)  Miles confirmed that McCormack never represented anything to her regarding accesses by county or city employees.  (Miles Dep. at 109.)

### 5.  The Incident Involving Miles' TCF Bank Account

In June of 2008, shortly after receiving the May 2008 DVS Letter and calling McCormack, Miles received notifications from TCF Bank ("TCF") about changes to her personal bank account.  (Miles Dep. at 34–35; Angolkar Aff., Exs. 6, 7 [Doc. Nos. 337-6, 337-7].)  Miles had not authorized any changes to her account.  (Miles Dep. at 28, 41.)  Understandably concerned and worried that these unauthorized changes were related to the unauthorized accesses of her driving record by the DVS employee, Miles called McCormack again.[6]  (*Id.* at 41, 46, 54, 59, 84.)

Miles took notes during this phone call as well.  (*Id.* at 31–32, 45; Angolkar Aff., Ex. 9 ("Miles' Second Call Notes") [Doc. No. 337-9].)  Those notes indicate that McCormack told her the following:

- The DVS employee in question worked in the southwestern part of Minnesota
- That Miles could speak with TCF about what was going on

---

[6] McCormack does not recall this phone conversation, but does not dispute that it happened.  (*See* McCormack Dep. at 67, 127.)

- That DVS could not reopen the investigation into the employee without "probable cause"
- That Miles could get more information from DVS through a court order or subpoena, including the identity of the DVS employee[7]
- That the DVS attorney was out of the office

(Miles' Second Call Notes; *see* Miles Dep. at 47–55.)  Miles claims that McCormack again assured her that "that it was a one-time incident, it was an employee, and it was taken care of."  (Miles Dep. at 52–53.)  Miles believed McCormack's reassurances that this was a limited breach, that the employee was merely curious, and that she did not need to be concerned.  (Miles Dep. at 51.)  Again, Miles did not request the internal audit, or that DVS perform another, broader audit.

### 6. Miles Continues to Investigate

Despite believing what McCormack told her, Miles continued to investigate.  On June 15, 2008, Miles located the anchor script for a KSTP segment that aired early in 2008, describing a story about two DPS employees who were accused of looking at the driving records of 400 people from their home computers.  (Miles Dep. at 55–56, 61; Angolkar Aff., Ex. 11 [Doc. No. 337-11].)  It is unclear whether this report caused Miles to suspect that others—not just the one DVS employee—had accessed her information, but she admits it is possible.  (Miles Dep. at 61–63.)

Days later, Miles went to James Barnum ("Barnum"), Deputy General Counsel at Hubbard Broadcasting, and described to him the contents of the May 2008 DVS Letter, her calls with McCormack, and the incident with her bank account.  (*Id.* at 67.)  Miles

---

[7] McCormack believes that she may have told Miles that she could get more information about the accesses of her records through a court order or subpoena.  (McCormack Dep. at 84–85.)

had consulted with Barnum about security issues in the past. (*Id.* at 65, 67–68.) Miles authorized Barnum to reach out to DVS and TCF on her behalf. (*Id.* at 76.)

On June 18, 2008, Barnum sent McCormack a letter that reiterated what Miles was told in the May 2008 DVS Letter, explained the incident with Miles' bank account, and asked that DVS cooperate with any investigation by TCF or law enforcement into whether the incidents were connected.[8] (Angolkar Aff., Ex. 15 ("Barnum Letter to DVS") [Doc. No. 337-15].) Barnum noted that Miles had authorized DVS to release to him "any and all information relative to [DVS's] investigation and/or handling of this matter that would be accessible by Ms. Miles." (*Id.*) However, this letter did not specifically request that DVS provide Miles/Barnum with the audit it had performed, or that it perform any additional audits. McCormack does not remember receiving Barnum's letter, but admits that she must have since she replied via email several days later to say that DVS would cooperate with any investigation by TCF. (McCormack Dep. at 146–48; Angolkar Aff., Ex. 19 [Doc. No. 337-19].)

On June 19, 2008, Barnum received an anonymous letter. (Angolkar Aff., Ex. 16 [Doc. No. 337-16].) The letter related to DPS and the unlawful access of drivers' data, mentioned Miles specifically, and encouraged KSTP to investigate. (*Id.*; Angolkar Aff., Ex. 12 ("Barnum Dep.") at 30–31 [Doc. No. 337-12].) KSTP asserted journalistic privilege over the anonymous letter and thus details about its contents are unavailable. (Angolkar Aff., Ex. 16.) However, Barnum did share and discuss the letter with Miles in

---

[8] Barnum sent similar letters to TCF asking that it investigate the unauthorized change to Miles' bank account and whether it was connected with the DVS employee's accesses. (Angolkar Aff., Ex. 17 [Doc. No. 337-17].)

the context of their investigation into DVS and TCF.  (Barnum Dep. at 49–50; Angolkar Aff., Ex. 21 [Doc. No. 337-21].)

Miles also continued investigating what had happened with the unauthorized change to her bank account.  On June 24, 2008, she emailed Barnum to explain that she had located another "Jessica Miles" on Facebook.  (Angolkar Aff., Ex. 18 [Doc. No. 337-18].)  This Jessica Miles had grown up in Maple Grove, where Miles had recently resided, and had just enrolled at Mankato State University, where the unauthorized change to Miles' bank account was made.  (*Id.*)  Miles stated that she was "sure that's where the mix-up occurred."  (*Id.*)  Still, Miles wanted to know how TCF made this "major mistake" and also "what information was accessed and by whom in the Department of Public Safety."  (*Id.*)

Days later, on July 2, 2008, TCF notified Barnum and Miles that the unauthorized changes to Miles' account were the result of an innocent mistake when the other "Jessica Miles" sought to change her TCF account and a TCF employee accidentally selected Miles' account.  (Barnum Dep. at 47–48; Miles Dep. at 87.)  TCF confirmed that Miles' personal information was not provided to the other "Jessica Miles."  (Angolkar Aff., Ex. 21.)  Miles believed TCF and no longer thought that the unauthorized change to her bank account was related to the DVS employee's access of her data.[9]  (Miles Dep. at 92.)

---

[9] In the complaint, Plaintiffs alleged that "upon information and belief, the access of [Miles'] private data of which she was informed by the DPS was related to the fraudulent access of her TCF bank account."  (Second Am. Compl. at ¶ 425.)  This is plainly inaccurate given that Miles knew and believed that these events were unrelated as early as July of 2008.

### 7. The 2013 DNR Letter

From July 2008 until early 2013, there is no evidence Miles did anything further to investigate whether her data was accessed by anyone else. At no point did Miles ever request that DPS or DVS provide her with an audit of the accesses of her private data contained on the databases. There is no evidence that DVS, or any other entity, contacted Miles about such accesses during this time. In fact, Miles was never contacted by Defendants regarding accesses of her records before this litigation commenced. (Miles Dep. at 30.)

In January 2013, Miles received a letter from the Minnesota Department of Natural Resources ("DNR") informing her that an employee of that agency had accessed and viewed her private data without a permissible purpose. (Angolkar Aff., Ex. 34 [Doc. No. 337-34].) After receiving this letter, Miles and Cory requested and received audits that showed all the entities that accessed their private data between 2003 and 2013. (Miles Dep. at 154–55; Cory Dep. at 46.) These audits showed numerous accesses by a variety of state, county, and municipal agencies over many years. (*See* Second Am. Compl., Exs. A, B [Doc Nos. 20-1, 20-2].) Many of these accesses occurred before May of 2008. (*See id.*) This lawsuit followed in September of 2013.

### 8. Cory Kampschroer

Cory never had any communications with DPS, DVS, or any other agency regarding accesses of his private data on the databases until 2013 when he requested an audit. (Angolkar Aff., Ex. 22 [Doc. No. 337-22].) Cory never communicated with McCormack directly. (Cory Dep. at 45; McCormack Dep. at 77.) Instead, Cory believes

he listened in on one or more of Miles' conversations with McCormack in 2008—which he thinks were on speakerphone—and knows he was shown the May 2008 DVS Letter that Miles received.  (Cory Dep. at 30, 48–50.)  However, Cory never received any letter regarding accesses of his private data and agrees that all of the conversations he overheard were specifically about Miles, not him.  (*Id.* at 37, 51.)  Miles and Cory also discussed her communications with McCormack, but these discussions were always focused on the accesses of Miles' data.  (*Id.* at 28–29, 50.)  Despite never speaking to DPS, DVS, McCormack, or any Defendant about accesses of *his* data—or receiving any communications on the subject—Cory felt "assured" that he did not have to worry about such breaches based on what he overheard and learned from Miles.[10]  (*See id.* at 46–47, 62–63.)  It was not until 2013 that Cory had any idea that his data was also accessed.  (*Id.* at 69, 71.)

## II.    DISCUSSION

### A.  Legal Standard

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50

---

[10] Plaintiffs offer no case law to support their position that McCormack's representations to Miles in 2008—which McCormack made with no knowledge that they would be heard by or shared with Cory—can serve as the basis for tolling the statute of limitations on Cory's claims, nor can the Court find any.  However, the Court need not resolve this issue since, as described below, it holds that the statute of limitations for Miles' claims is not tolled.  If tolling does not apply to Miles, it also cannot apply to Cory.

(1986); *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1107 (8th Cir. 2016). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. *Id.* at 323. However, a party opposing summary judgment "'may not rest upon the mere allegation or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256–57). "[T]he nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 910 (8th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Summary judgment is also proper where the non-moving party fails "'to make a showing sufficient to establish the existence of an element essential to that party's case . . . .'" *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 844 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 322).

### B.  The DPPA and Its Statute of Limitations

The DPPA does not contain its own statute of limitations and thus is subject to the catch-all, four-year statute of limitations in 28 U.S.C. § 1658(a). *McDonough v. Anoka Cty.*, 799 F.3d 931, 939 (8th Cir. 2015). The so-called discovery rule—which directs that

a statute of limitations begins to run when the plaintiff discovers, or with due diligence should have discovered, that the alleged violation occurred—does not apply to the DPPA. *Id.* at 940–43. Instead, a DPPA claim accrues and the statute of limitations begins to run when the improper access occurs. *Id.* at 943. As the Eighth Circuit explained, "even if [DPPA plaintiffs] had no reason to know of the alleged accesses, unlike violations grounded in fraud, latent disease, or medical malpractice, DPPA violations are not by their nature self-concealing." *Id.*; *see Foudy v. Indian River Cty. Sheriff's Office*, 845 F.3d 1117, 1125 (11th Cir. 2017) (holding that DPPA violations were not self-concealing—because they did not involve fraud or deception—and thus equitable tolling was unavailable on that basis). "Furthermore, faded memories and time-lost evidence pertaining to the disclosure, obtainment, or use of data are the types of considerations that statutes of limitation are intended to address." *McDonough*, 799 F.3d at 943.

As previously discussed, the Kampschroers brought suit on September 15, 2013. *See supra* Part I.A. Thus, in the absence of the application of an equitable doctrine, the Kampschroers' claims based on accesses before September 15, 2009 must be dismissed as time-barred.

## C. Potential Equitable Theories

It is not entirely clear which equitable theory the Kampschroers believe should apply. They advance arguments related to equitable tolling, equitable estoppel, and fraudulent concealment. (*See* Pls.' Mem. in Opp. at 24–37.) The Court briefly distinguishes these various equitable theories.

Parties and the courts frequently "blur" the "related yet distinct doctrines" of

equitable tolling and equitable estoppel. *Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323, 1328 (8th Cir. 1995). Relief under either doctrine is an exception to the rule set by a statute of limitations "and should therefore be used only in exceptional circumstances." *Id.* at 1330; *see Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 675 (8th Cir. 2009) ("Because statutes of limitations protect important interests of certainty, accuracy, and repose, equitable tolling is an exception to the rule, and should therefore be used only in exceptional circumstances." (citation omitted)); *Jenkins v. Mabus*, 646 F.3d 1023, 1028 (8th Cir. 2011) (holding that equitable tolling and equitable estoppel should be employed "sparingly" because they involve the waiver of sovereign immunity). The plaintiff bears the burden of proving that one or both of these doctrines applies to save his/her claim. *Jenkins*, 646 F.3d at 1028. However, "[w]hile equitable tolling extends to circumstances outside both parties' control, the related doctrines of equitable estoppel and fraudulent concealment may bar a defendant from enforcing a statute of limitation when its own deception prevented a reasonably diligent plaintiff from bringing a timely claim." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 164 (2013) (Sotomayor, J. concurring).

"The doctrine of equitable tolling permits a plaintiff to sue after the statutory time period has expired if he has been prevented from doing so due to inequitable circumstances." *Firstcom*, 555 F.3d at 675 (citation omitted). "Equitable tolling is appropriate when the plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of his claim. *Equitable tolling does not require any misconduct on the part of the defendant.*" *Bell v. Fowler*, 99 F.3d 262, 266 n.2 (8th Cir.

1996) (emphasis added) (citations omitted).  To invoke tolling, the plaintiff must prove that: (1) he diligently pursued his rights, and (2) "some extraordinary circumstance stood in his way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

In contrast, "[e]quitable estoppel presupposes that the plaintiff knows of the facts underlying the cause of action but delayed filing suit *because of the defendant's conduct*."  *Bell*, 99 F.3d at 266 n.2 (emphasis added).  "To show equitable estoppel, a plaintiff must be aware of her claim, but fail to file timely due either to the [defendant's] deliberate design, or to [the defendant's] acts that it should unmistakably have understood would cause the [plaintiff] to delay . . . ."  *Jenkins*, 646 F.3d at 1028.  Thus, the focus is on the defendant's conduct and the plaintiff must prove that the defendant prevented him/her from suing in a timely fashion.[11]  *Id.* at 1027–28.

Here, the Kampschroers' arguments rest entirely on the alleged misrepresentations of DVS-DPS through its agent, McCormack.  DPS is a not a Defendant.  Conspicuously missing is any evidence that any of the county, municipal, or state Defendants made any effort to mislead or deceive the Kampschroers about the extent of the improper accesses.

---

[11]  Fraudulent concealment, which is "very similar to the discovery rule[,]" saves a plaintiff's non-fraud claims from a statute of limitations where the defendant "fraudulently concealed the facts underlying the cause of action."  *TCF Nat. Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 711 (8th Cir. 2016).  "The defending party must have taken affirmative acts intended to, and successful in, preventing discovery of the cause of action."  *Id.*  With its focus on a defendant's attempts at deception, fraudulent concealment is essentially indistinct from equitable estoppel.  However, fraudulent concealment is sometimes invoked as the basis for employing equitable tolling.  *See Jones v. Frost*, 770 F.3d 1183, 1185 (8th Cir. 2014).  Regardless, Plaintiffs' arguments related to fraudulent concealment fail for the same reasons their arguments regarding tolling and estoppel fail.

Nor is there any evidence that would warrant imputing McCormack's representations to Defendants.[12]

The Kampschroers cite no case law, and the Court can find none, suggesting that the misrepresentations of a third party may serve as the basis to invoke equitable estoppel. Rather, the case law makes clear that only a *defendant's* conduct is relevant to the estoppel inquiry. *See Dring*, 58 F.3d at 1329; *Bell*, 99 F.3d at 266 n.2; *Jenkins*, 646 F.3d at 1028; *Loeffler v. City of Anoka*, No. 13-cv -2060 (MJD/TNL), 2016 WL 7971214, at *5 (D. Minn. Oct. 25, 2016), *report and recommendation adopted*, No. 13-cv-2060 (MJD/TNL), 2017 WL 123424 (D. Minn. Jan. 12, 2017) (refusing to employ equitable estoppel to save a plaintiff's DPPA claims where DPS, not the named municipal defendants, allegedly prevented the plaintiff from discovering her claims). Thus, equitable estoppel cannot save the Kampschroers' claims. However, the deceptive conduct of a third party might constitute the sort of extraordinary circumstance outside the parties' control that warrants equitable tolling. *See Bell*, 99 F.3d at 266 n.2 (tolling requires no misconduct by the defendant); *Sebelius*, 568 U.S. at 164 (tolling applies to circumstances outside the parties' control). The Court considers this issue below.

---

[12] Plaintiffs argue that they should have the opportunity to conduct additional discovery aimed at producing evidence that Defendants colluded with DPS to disguise the extent of the accesses of Plaintiffs' private data. (*See* Pls.' Mem. in Opp. at 21–23, 36–37.) However, Plaintiffs have never alleged that any such collusion took place. Their allegations regarding equitable tolling focus exclusively on McCormack and DPS, not any of the county, municipal, or other state Defendants. (*See* Second Am. Compl. at ¶¶ 410–26.) The Court will not allow Plaintiffs to engage in additional discovery based on their newly hatched collusion theory. To do otherwise would allow Plaintiffs to utilize discovery as an impermissible fishing expedition. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009); *N.L.R.B. v. Davenport Lutheran Home*, 244 F.3d 660, 663 (8th Cir. 2001).

### D. Equitable Tolling

The Kampschroers' arguments revolve around a single central theme: disputed material facts preclude summary judgment on the issue of equitable tolling. (*See* Pls.' Mem. in Opp. at 24–32.) For instance, they argue that a jury must decide whether it was reasonable for Miles to believe that the references to an "internal audit" that found a DVS "employee" had improperly accessed her private data—coupled with McCormack's assurance that this was an "isolated incident"—meant that no other entities had improperly accessed her data. (*Id.* at 25–27.) Similarly, the Kampschroers contend that a jury might conclude that McCormack knew—or should have taken steps to discover—the extent of the accesses of Miles' private data by other entities (e.g., Defendants), yet failed to communicate that information to Miles. (*See id.* at 27–32.)

As previously discussed, to successfully invoke equitable tolling a plaintiff must prove that: (1) he diligently pursued his rights, and (2) "some extraordinary circumstance stood in his way." *Pace*, 544 U.S. at 418. A "positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed[,]" would warrant tolling. *Jones v. Frost*, 770 F.3d 1183, 1186 (8th Cir. 2014) (citation omitted). Similarly, tolling might be appropriate where there was conduct that "lulled the plaintiff into inaction." *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000); *see Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (holding that tolling was warranted where "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass"). However, tolling will not apply even where there was fraud if the plaintiff "could have discovered the fraud or sufficient

other facts on which to bring [a] lawsuit, through a reasonable effort." *Jones*, 770 F.3d at 1186 (citation omitted) (alteration in original); *see Johnson v. Berry*, 171 F. Supp. 2d 985, 989 (E.D. Mo. 2001) ("[A] plaintiff who unreasonably relies on the reassurances of a wrongdoer has not satisfied this obligation of due diligence." (citation omitted)).

Again, tolling is appropriate only in rare cases with "exceptional circumstances truly beyond the plaintiff's control." *Jenkins*, 646 F.3d at 1028–29. Tolling does not apply where a plaintiff is aware of the facts underlying his/her claim, but is ignorant as to their legal significance. *See Jenkins*, 646 F.3d at 1029; *Shaver v. Astrue*, 783 F. Supp. 2d 1072, 1076 (N.D. Iowa 2011); *Johnson*, 171 F. Supp. 2d at 990. Confusion regarding the applicable statute of limitations does not warrant tolling. *See Kreutzer*, 231 F.3d at 463. "Even in the case of an unrepresented prisoner alleging a lack of legal knowledge or legal resources, equitable tolling has not been warranted. Thus, tolling is even less appropriate in a case where the petitioner is represented by counsel." *Id.* (citations omitted).

Numerous courts have found that tolling is unavailable in the context of the DPPA. In one case, the plaintiffs argued that tolling should save their claims because they did not know about any accesses of their private data until they received a letter from the Minnesota DNR regarding improper accesses by one of its employees.[13] *Kost v. Hunt*, 983 F. Supp. 2d 1121, 1130 (D. Minn. 2013). The plaintiffs asserted that they had no reason to request an audit of their records until they received this notification. *Id.* The court refused to apply tolling under these circumstances, reasoning that "treating

---

[13] The Kampschroers received a similar letter involving the same Minnesota DNR employee. *See supra* Part I.B.7.

Plaintiffs' mere lack of knowledge of an injury—in the absence of any external factor that stood in their way of discovery—as sufficient for equitable tolling, would essentially create an end-run around the Court's finding that the discovery rule does not apply to DPPA claims." *Id.* A plaintiff's misunderstanding about the need to request an audit from DPS to discover all of his/her DPPA claims also does not warrant tolling. *See Smythe v. City of Onamia*, No. 12-cv-3149 (ADM/LIB), 2014 WL 4096966, at *4 (D. Minn. Aug. 19, 2014) (holding that while a pro se plaintiff's "difficulties" in obtaining information about the accesses of his private data were "understandable," they did not "rise to the extraordinary level required for tolling"). Even where DPS initially refused a plaintiff's audit request—demanding that the plaintiff provide a "specific reason" for the audit—equitable tolling failed to save that plaintiff's DPPA claims. *See Loeffler*, 2016 WL 7971214 at *1, 5.

The Kampschroers' arguments for equitable tolling fail for at least four reasons. First, there is no evidence that McCormack intended to deceive or mislead Miles. McCormack relayed to Miles what she knew—that an "internal audit" produced evidence that a DVS/DPS "employee" improperly accessed Miles' private data and she referred to that incident as "isolated." *See supra* Part I.B.4–5. The fact that Miles apparently misunderstood the scope of what McCormack was telling her is not evidence that McCormack intended to deceive her. *See Bell*, 99 F.3d at 266–69 (holding that the defendant did not intend to mislead or deceive the plaintiff where he inadvertently provided the plaintiff with incorrect information and failed to provide the correct information when he later learned of the mistake); *Jenkins*, 646 F.3d at 1028 (finding no

intent to deceive or mislead despite the defendant creating "some confusion" about how/if the plaintiff could file her harassment claim); *Miller v. Runyon*, 32 F.3d 386, 390 (8th Cir. 1994) (denying tolling where the plaintiff merely misunderstood accurate information provided by the defendant). Notably, McCormack even told Miles how she could get more information with a court order or subpoena, refuting the assertion that McCormack hoped to keep Miles in the dark. *See supra* Part I.B.5.

Second, the Kampschroers fail to establish that their situation differs from that of any other DPPA plaintiff. In fact, the evidence shows that they were in a better position to discover their claims than many other plaintiffs. In May of 2008, Miles was informed that a DVS employee had accessed her private data for improper reasons, alerting her to the facts underlying at least one DPPA claim. Even if Miles did not understand the legal significance of those facts, tolling is unwarranted. *See Jenkins*, 646 F.3d at 1029; *Shaver*, 783 F. Supp. 2d at 1076; *Johnson*, 171 F. Supp. 2d at 990. McCormack told Miles how she could get additional information, but even if Miles was confused about the need to request an audit of her records, that cannot form the basis for equitable tolling. *See Smythe*, 2014 WL 4096966 at *4.

Despite believing that the accesses of her private data were isolated, Miles engaged in her own investigation. *See supra* Part I.B.6. In this process, Miles had the assistance of an attorney, a fact that weighs against tolling. *See Kreutzer*, 231 F.3d at 463. Moreover, during her investigation she discovered evidence suggesting that there were widespread improper accesses of drivers' private data and even received an anonymous tip on this subject that specifically mentioned her. *See supra* Part I.B.6.

Despite these discoveries—and McCormack's advice on how Miles could obtain more information with a court order or subpoena—Miles never sought an order or subpoena, nor did she even request that DPS provide her with the audit. *See Loeffler*, 2016 WL 7971214 at *1, 5 (refusing to apply equitable tolling even where DPS rejected the plaintiff's request for an audit). In short, Miles had reason to believe that her private data was improperly accessed and could have, with reasonable effort, discovered the extent of the accesses. Her failure to do so—even if the result of her misunderstandings about the scope of information McCormack provided her, or confusion about what she needed to do to get additional information—means tolling is unavailable. *See Jones*, 770 F.3d at 1186; *see Johnson*, 171 F. Supp. 2d at 989.

Third, the Kampschroers argue that tolling is appropriate because McCormack "recklessly failed to initiate a more thorough audit" despite having reason to believe that there were widespread improper accesses of Miles' data. (*See* Pls.' Mem. in Opp. at 29–30.) However, they offer no factual support or case law in support of this proposition and the Court can find none. Moreover, the Kampschroers have no claim against DPS for its alleged negligence in failing to investigate. *See Potocnik v. Carlson*, 9 F. Supp. 3d 981, 992 (D. Minn. 2014) (holding that the DPPA does not impose a duty of care on DPS in creating and maintaining the databases); *Tichich v. City of Bloomington*, No. 14-cv-298 (DSD/SER), 2014 WL 3928530, at *3 (D. Minn. Aug. 12, 2014), *aff'd,* 835 F.3d 856 (8th Cir. 2016) (holding that the DPPA does not impose a duty of care on DPS to make reasonable efforts to ensure that users have a permissible purpose for their accesses).

Fourth, allowing equitable tolling here would substantially prejudice Defendants.

*See Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 757 n.5 (2016) (holding that prejudice to the defendant is a factor to considered when deciding equitable tolling).  If tolling were allowed, the parties, the Court, and a jury would have to discern whether accesses that occurred nine or more years ago were for a proper purpose.  As Defendants point out, their ability to defend against these claims would be severely hampered by faded memories and the fact that many of the employees at issue have since left their employment or passed away.  (Minneapolis' Mem. in Supp. at 16–17, 29–31 [Doc. No. 341].)  The understandable difficulties associated with recalling events from so long ago, let alone producing documentary evidence from that time, are evident in the testimony of McCormack, Miles, and Cory.  (*See, e.g.,* McCormack Dep. at 20–21, 28, 41–42, 46–47, 56, 61, 66–67, 92, 97, 100; Miles Dep. at 49, 67, 70, 101, 112–13, 145; Cory Dep. at 13, 28, 39, 54–55.)  These difficulties and the prejudice that accompanies them are the reason for the four-year statute of limitations on DPPA claims and weigh against tolling here.  *See McDonough*, 799 F.3d at 943; *Firstcom*, 555 F.3d at 675; *Kost*, 983 F. Supp. 2d at 1130.

# III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. Defendants' Motions for Summary Judgment [Doc. Nos. 334, 339] are **GRANTED** as follows:

   a. Plaintiffs' claims based on accesses of their private data that occurred before September 15, 2009 are time-barred and **DISMISSED with prejudice.**

2. It is unclear from the record whether any Defendants may be dismissed because all of their alleged accesses occurred before September 15, 2009. Defendants are **ordered** to file a brief accounting of which Defendants may properly be dismissed from this case by virtue of this Order, **no later than August 14, 2017**. If Plaintiffs disagree with Defendants' accounting, they **may file** objections **no later than August 21, 2017**.

3. The parties are **ordered** to immediately contact Magistrate Judge Leung's chambers for the purpose of obtaining an expedited schedule for any remaining discovery. This case will be made trial ready as soon as is practicable.


Dated: August 2, 2017                         s/ Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge